# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br>        Plaintiff,<br><br>        v.<br><br>Walmart Inc. & Branch Messenger, Inc.,<br>        Defendants. | COMPLAINT<br><br>Case No. 24-cv-4610 |

The Consumer Financial Protection Bureau (Bureau) brings this action against Walmart Inc. (Walmart) and Branch Messenger, Inc. (Branch) (together, the Defendants) for violations of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a)(1)(B); and against Branch for violations of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693c, 1693d, 1693e, 1693f, 1693*l*, its implementing Regulation E, 12 C.F.R. pt. 1005; the Truth in Savings Act (TISA), 12 U.S.C. § 4302(e), its implementing Regulation DD, 12 C.F.R. § 1030.8; and the CFPA, 12 U.S.C. § 5536(a)(1)(A).

## INTRODUCTION

1.      Branch is a financial technology company that, since January 2020, has offered a product called the Branch Account, which includes a deposit account

1

at Evolve Bank & Trust (Evolve) that consumers access through a mobile application and debit card provided by Branch.

2.    Since 2018, Walmart has operated a delivery program called Spark Driver, in which individual workers (Spark Drivers) perform "last mile" deliveries from Walmart stores nationwide.

3.    In connection with the Walmart Spark Driver program, Defendants required Spark Drivers to receive their pay using Branch Accounts, a costly and risky product. Walmart told Spark Drivers they would be terminated from the Spark Driver program if they did not use a Branch Account.

4.    Defendants opened Branch Accounts and deposited Spark Drivers' wages into those accounts without their informed consent, and in many instances, on an unauthorized basis, and then predicated Spark Drivers' access to their earnings on consent to Branch's terms and conditions. Defendants also made deceptive statements about Branch Accounts to Spark Drivers. Through their conduct, Defendants harmed consumers and engaged in unfair, abusive, and deceptive practices in violation of the CFPA.

5.    Branch, in connection with offering or providing Branch Accounts to consumers, also violated TISA and its implementing Regulation DD, EFTA and its implementing Regulation E by making misrepresentations about Branch Accounts, including its capabilities for instant access to earnings or same-day pay, stop

payments, and transfers; requiring some consumers to waive their rights under EFTA; and failing to provide required disclosures and notices, honor stop payment requests, investigate and resolve alleged errors, and maintain necessary records. By violating TISA and its implementing Regulation DD, and EFTA and its implementing Regulation E, Branch also violated the CFPA.

## JURISDICTION & VENUE

6.    This Court has subject-matter jurisdiction over this action because it is brought under "federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

7.    The Court has personal jurisdiction over the Defendants in this action because each Defendant conducts business in this district. In addition, Branch is headquartered in Minnesota.

8.    Venue is proper in this district because Branch and Walmart are located, reside, or do business here, 12 U.S.C. § 5564(f).

## PARTIES

9.    The Bureau is an independent agency of the United States created by the CFPA and charged with enforcing "Federal consumer financial laws." 12 U.S.C. § 5491(a).

10.    The Bureau is authorized to initiate civil actions in federal district court in its own name and through its own attorneys to address violations of "Federal consumer financial law," including the CFPA, EFTA and its implementing Regulation E, and TISA and its implementing Regulation DD, and to secure appropriate relief for violations of those provisions. 12 U.S.C. §§ 5564(a)-(b), 5565, 5481(12)(C), (12)(P), (14).

11.    Branch is a financial technology company headquartered in Minneapolis, Minnesota.

12.    Walmart is a multinational retailer headquartered in Bentonville, Arkansas.

## FACTUAL ALLEGATIONS

### The Spark Driver Program

13.    In 2018, Walmart established the Walmart Spark Driver program, in which Spark Drivers fulfill deliveries for Walmart customers by delivering orders from Walmart stores to customers.

14.    The typical Spark Driver is a woman, has children, does not have a college degree, and is low income.

15.    Spark Drivers commonly use wages earned from the Spark Driver program for personal, household, and family expenses, such as groceries, housing, household utilities, transportation costs, childcare, educational expenses, and

paying down personal debt. During the period when Defendants required Spark Drivers to access their earnings through a Branch Account, Spark Drivers' top use of the associated Branch debit card was for groceries.

16.    Wanting to quickly grow its business in the booming delivery market, in 2018 Walmart engaged Delivery Drivers, Inc., a third-party administrator (Administrator or Walmart's Administrator), to work directly with Spark Drivers on its behalf by recruiting and onboarding the drivers and processing their compensation. Walmart's Administrator performed these functions on behalf of Walmart until August 17, 2022, when Walmart purchased substantially all of its assets and hired the vast majority of its employees. Throughout its relationship with its Administrator, Walmart authorized the Administrator to act on its behalf, and held the Administrator out to Spark Drivers as having the authority to act on its behalf, with respect to the hiring, onboarding, and payment of Spark Drivers.

17.    Walmart had knowledge of, and the authority to control, its Administrator's conduct with respect to the payment of Spark Drivers.

18.    Walmart retained the right to reject or approve its Administrator's use of any additional vendors for its work on the Spark Driver program and dictated the number of Spark Drivers to be hired into the program and the screening standards to be applied during hiring.

19.    Walmart retained the right to control the payments its Administrator made to Spark Drivers, whether on its own or on behalf of Walmart.

20.    Walmart closely monitored and directed its Administrator's performance, including through daily conversations and instructions, and in monthly and quarterly audits and reviews.

21.    In the Administrator's advertisements for the Spark Driver program and in application and onboarding materials, the Administrator used Walmart's name and branding with Walmart's knowledge and consent.

22.    Spark Drivers often directed questions regarding payments, taxes, and insurance related to the Spark Driver program to both Walmart and its Administrator interchangeably, and Walmart expected its Administrator to interact with Spark Drivers on those topics.

## **Walmart and its Administrator Engage Branch**

23.    From 2018 until August 2021, Walmart paid Spark Drivers weekly through direct deposit. Walmart would transmit Spark Driver payments to the Administrator, who then disbursed the payments into accounts selected by the drivers themselves.

24.    As early as 2020, other last-mile delivery programs were offering drivers the option of receiving their earnings on a daily basis. By 2021, most of

Walmart's competitors were offering some type of instant pay, allowing workers to obtain pay after every job performed.

25.    In June 2021, Walmart's Administrator contracted with Branch in the hopes that processing wage payments through Branch Accounts would enable the Administrator to streamline costs, grow the Spark Driver program faster, and advertise the possibility of same-day pay.

26.    Branch and Walmart's Administrator agreed that Branch would be the exclusive payment provider for the Spark Driver program.

27.    Walmart knew about its Administrator's agreement with Branch and did not raise any objection to it.

28.    Walmart and its Administrator were primarily responsible for communications and advertisements to Spark Drivers regarding the introduction of Branch Accounts to Spark Drivers. Branch reviewed Walmart's Administrator's communications to Spark Drivers advertising Branch.

29.    Branch does not offer accounts directly to consumers; rather, it engages partners, like Walmart, that hire and pay workers, to offer Branch to their workers, and assist with enrolling their workers in Branch Accounts.

30.    Consumers access their Branch Accounts solely by using Branch's mobile application or debit card.

31.    Branch is not FDIC insured.

## Defendants' Account Opening Process

32.    Defendants designed and implemented an account-opening process specific to the Spark Driver program that enabled them to open and fund Branch Accounts for Spark Drivers without their informed consent, and in many instances, on an unauthorized basis. Spark Drivers did not understand the terms and conditions of the Branch Account—or even what type of account they were being provided. In order to obtain access to their account and their Spark Driver earnings, consumers were forced to accept the terms of the Branch Account.

33.    Defendants launched this account opening process in or around July 2021.

34.    By July 2021, the Spark Driver program had tens of thousands of Spark Drivers (Existing Drivers).

35.    In late July 2021, Walmart and its Administrator began communicating to Existing Drivers that they would be required to use a Branch Account to be paid, and that beginning August 10, 2021, wages would be made available only in Branch Accounts, rather than through a deposit to an account of the driver's choice.

36.    At some point before August 10, 2021, without the Existing Drivers' knowledge and without obtaining their consent, Defendants opened unauthorized Branch Accounts for most Existing Drivers. Walmart and its Administrator already

possessed drivers' personal information, which included social security numbers. They shared this sensitive personal information with Branch, also without Existing Drivers' knowledge or consent to share. Once Branch received the personal information, it would in turn use that information to open Branch Accounts capable of receiving electronic fund transfers for each driver, without the driver's knowledge or consent. For Existing Drivers to become aware of, and to access their Branch Accounts and earnings, several additional steps had to occur.

37.     First, on or before August 10, 2021, Walmart's Administrator sent communications to Existing Drivers alerting them that they needed to "sign up" for Branch and directed them to click what the Defendants referred to as a "magic link" to "claim" their account.

38.     Upon clicking the "magic link," the Existing Driver downloaded Branch's mobile application, and then proceeded through Branch's access process. During the access process, the Existing Driver confirmed the personal information that Walmart and its Administrator already had shared with Branch, was offered the opportunity to view terms and conditions, and then had to check a box agreeing to the Branch terms and conditions.

39.     At no point before this were Existing Drivers presented with Branch's terms and conditions.

40.   Once the Existing Driver agreed to the terms and conditions, Branch conducted an identity verification process known as Know Your Customer, and if the driver was approved, Branch granted them access to their already-opened (and sometimes already-funded) Branch Account.

41.   On or around August 10, 2021, Walmart and its Administrator made deposits into tens of thousands of Existing Drivers' unauthorized Branch Accounts. By this point, many Existing Drivers were not aware that accounts had been opened for them using their personal information, and thousands of Existing Drivers had not yet completed the process to access their accounts, which now contained their earnings. These drivers had to complete Branch's access process and "agree" to Branch's terms and conditions to gain access to wages they had already earned.

42.   Spark Drivers who joined the program just before or after the August 10, 2021 pay day (New Drivers) experienced the account opening process in a similar way. Over the next two years, Defendants would open over a million Branch Accounts for New Drivers using this process.

43.   Walmart and its Administrator gathered New Drivers' personal information, including their social security numbers, as part of the Spark Driver application process and sent it to Branch. Branch, in turn, would open Branch Accounts, into which Walmart and its Administrator deposited earnings.

44.    Then, generally on or after their first pay day, the New Drivers would receive a communication with the "magic link" from Walmart or its Administrator and be required to download the Branch application, agree to Branch's terms and conditions, and obtain approval through the Know Your Customer process to access their already-open account and their earnings.

45.    Like with accounts for Existing Drivers, Walmart and its Administrator did not obtain New Drivers' consent to share their personal information with Branch, or to open or fund accounts for them at Branch.

46.    From June 2021 until at some point in 2022, Walmart and its Administrator did not disclose the requirement to use Branch—or any information about Branch or the Branch Account—to applicants for the Spark Driver program during the Spark Driver online application process. At the same time, Defendants were opening Branch Accounts for them.

47.    At some point in 2022, Walmart added limited information about the Branch product to the online application. After that point, New Drivers encountered a screen in the online application where they were required to "agree" to be paid through Branch in order to proceed with the application.

48.    Neither this screen nor any other part of the application included Branch's terms and conditions, or basic information about the Branch Account,

such as fees, withdrawal limits, limitations on use, the type of account, or other terms.

49.     From July 2021 until it acquired its Administrator's assets, Walmart provided earnings to Spark Drivers' Branch Accounts by sending payments to its Administrator, which the Administrator then deposited into the drivers' Branch Accounts, as it had previously done with direct deposit. Upon acquiring its Administrator's assets, Walmart deposited Spark Drivers' earnings to their Branch Accounts directly.

50.     Walmart and Branch maintained the same account opening process described in Paragraphs 36–45 after Walmart acquired its Administrator's assets, until approximately February 2023, when Walmart added links to Branch Account terms and conditions in the Spark Driver application.

51.     Until approximately August 2023, Walmart continued to share, without authorization, every New Driver's personal information with Branch. Branch would then open a Branch Account for each New Driver.

## **Defendants' Account Opening Process Confused and Harmed Walmart Spark Drivers**

52.     The Defendants' account opening and funding process was confusing and harmful to Spark Drivers.

53.    Spark Drivers did not understand why they were being required to use Branch, and why accounts had been opened in their name without their consent.

54.    Once Spark Drivers learned that Branch Accounts had been opened for them and their earnings deposited into those accounts, they often approached Walmart, Walmart's Administrator, or Branch to ask whether they could return to direct deposit or choose not to use Branch. All three communicated clearly that neither was an option.

55.    Walmart and its Administrator further told Spark Drivers that they would be terminated from the Spark Driver program if they would not or could not receive their earnings through Branch.

56.    Walmart removed Spark Drivers from the Spark Driver program if they were unable to or would not use a Branch Account, making them ineligible to drive and earn income. When Walmart or its Administrator had already deposited Spark Driver earnings to those Branch Accounts, Branch transferred the earnings back to Walmart or its Administrator, rather than to the Spark Driver directly.

57.    Some Spark Drivers were distraught that they were losing their jobs because they were not able to use Branch. Others were confused by the multi-step process necessary to access the Branch Accounts and were concerned about Defendants' use of their personal information to set up the accounts.

58.     Spark Drivers also did not understand how the accounts operated, including the terms of the account, such as fees and transfer capabilities and limitations.

59.     Many Spark Drivers wanted to continue receiving their earnings in an account of their choice, and faced challenges and costs when attempting to transfer their earnings into those accounts.

60.     Not only did Spark Drivers find Defendants' account opening process confusing and costly, but the process caused delays in Spark Drivers' access to their Branch Accounts and their earnings.

61.     There were often significant—sometimes weekslong—delays between when accounts were opened and when Spark Drivers gained access to the accounts.

62.     When a Spark Driver's earnings were deposited into a Branch Account before a Spark Driver had access to it, the delay in account access also meant a delay in pay.

63.     Between approximately July 2021 through August 2023, Walmart and its Administrator deposited, and Branch accepted, tens of millions of dollars in Spark Driver wages into over 100,000 Branch Accounts before Spark Drivers gained access to them, often weeks later.

64.     Spark Drivers could only obtain their money that was already deposited into a Branch Account by going through Branch's access process, which

forced them to agree to Branch's terms and conditions. Spark Drivers who would

not or could not complete Branch's access process were terminated from the Spark

Driver program.

65.    Spark Drivers often contacted Walmart's Administrator to say that

they had not been paid. The Administrator would respond by telling Spark Drivers

that they needed to accept Branch's terms and access their Branch account in order

to obtain their earnings.

66.    Walmart and its Administrator also deposited hundreds of thousands

of dollars into thousands of accounts to which Spark Drivers never gained access.

As of May 2024, wages still remained in some of these accounts. For others,

Branch remitted wages back to Walmart or its Administrator, often after weeks

passed with the funds sitting in the accounts without being accessed.

67.    Branch sometimes closed Branch Accounts belonging to Spark

Drivers, resulting in those drivers being terminated from the Spark Driver program.

In such cases, Branch also remitted any funds remaining in the now-closed account

back to Walmart or its Administrator, as opposed to the Spark Driver to whom the

funds belonged.

68.    Walmart, Walmart's Administrator, and Branch also created over

600,000 Branch Accounts for Spark Drivers to which Spark Drivers never gained

access, and that appear to have had no activity.

69.     Spark Drivers who did gain access to the Branch Accounts faced costs or other inconveniences associated with receiving their wages in a Branch Account and using their wages as they intended, including for personal, household, and family purposes.

70.     Spark Drivers who received wages through a Branch Account but did not want to keep their money in it were presented with two options.

   a.  Option 1: Spark Drivers could pay a fee of either 2 percent of the transferred amount or $2.99, whichever was greater, for an "instant" transfer. For example, a Spark Driver who made $500 per week would pay $10 to Branch every week to transfer their earnings to an account of their choice. In order to accomplish this "instant" transfer, a Spark Driver had to provide Branch with a debit card associated with the account that would receive the transfer. Spark Drivers chose this more frequently than Option 2, as many drivers needed, and had been promised, quick access to their already-deposited compensation. During the period that Defendants required Branch Accounts, Spark Drivers paid over $10 million to Branch in fees to instantly transfer hundreds of millions of dollars to an account of their choice.

   b.  Option 2: Spark Drivers could link their Branch Account to a separate financial data transfer company that could be used to initiate an ACH

transfer of their funds to an external account of their choosing. Option 2 did not have a fee, but could take up to 5 days, was available only if the receiving account was at a bank partnered with the separate financial data transfer company, and required the Spark Driver to provide personal information and sensitive banking information to the financial data transfer company. Many Spark Drivers did not want to or could not wait additional time after their pay day to use their wages from an account of their choice, and did not want to share information with yet another financial institution, especially after learning their personal information already had been shared and used without their consent.

71.    Aside from Options 1 and 2, it was possible for Branch accountholders to use an account at another financial institution to initiate an ACH transfer from the Branch Account without a fee, a process that could take up to 5 days. Branch did not publicize this capability to Spark Drivers and few, if any, Spark Drivers appeared to be aware of it.

72.    For either Option 1 or 2, Branch also imposed daily and monthly limits on how much money Spark Drivers could transfer out of their accounts.

73.    Spark Drivers also could use a Branch "virtual debit card" to make online purchases or order a physical debit card to make online or point-of-sale purchases or withdraw cash, but only up to certain daily and monthly limits.

74.    Spark Drivers reported delays in receiving their physical debit cards, preventing them from withdrawing cash.

75.    Further, since June 2022, Branch has charged its accountholders a $2 fee for each cash withdrawal from somewhere other than one of its "in network" ATMs, which are generally located in retail stores. Spark Drivers had difficulty accessing "in network" ATMs, particularly when they needed to withdraw money after the retail stores had closed for the day.

76.    Branch accountholders, including Spark Drivers, could not write checks from their Branch Accounts.

77.    Branch accountholders, including Spark Drivers, could not make their own deposits to Branch Accounts without paying fees.

78.    Branch accountholders, including Spark Drivers, who wanted to deposit a check to their Branch Account had to download a separate mobile application that partnered with Branch in order to do so, and pay a fee to that mobile application. Branch does not disclose this fee to accountholders.

79.    Branch accountholders, including Spark Drivers, who wanted to deposit cash to their Branch Account had to visit certain specified retail locations

in order to do so, and pay a fee to a third party. Branch does not disclose the amount of this fee to accountholders.

80.    Many Spark Drivers indicated that the transition to Branch caused personal financial challenges. For example, because Branch Accounts do not have check-writing capability, Spark Drivers had to transfer their earnings out of their accounts in order to write a check, which caused some Drivers to be late on payments such as rent. For other Spark Drivers, the daily withdrawal and transfer limits meant that they couldn't access their earnings when they needed them.

81.    Whether they decided to transfer their wages or keep them in a Branch Account, Spark Drivers faced barriers at every turn; for example, when one Spark Driver had housing payments due, which could not be paid by debit card, the driver found that Branch's limits on ATM withdrawals prevented her from withdrawing enough cash to pay those bills on time, and the alternatives of transferring money from Branch into another account were also unworkable because they required the driver to pay fees to access her money, or wait longer for a transfer that did not charge fees.

82.    Defendants' requirement that Spark Drivers be paid through Branch Accounts also harmed Spark Drivers by placing their wages in a financial institution which caused or risked loss of funds or failed to address consumer complaints and disputes. For example, Branch did not respond in a timely manner,

and sometimes did not respond at all, to consumers who needed assistance from Branch customer service, including for potential fraud on their account. Branch's failures to comply with EFTA and Regulation E also made the accounts riskier for consumers.

## Branch's Attempts to Deprive Consumers of Their Rights

83.    Defendants' account opening and funding process not only coerced Spark Drivers into using Branch, but it also allowed Branch to improperly label most accounts opened for Spark Drivers as so-called "business" accounts, without Spark Drivers' knowledge.

84.    Since 2021, Branch has labeled its Branch Accounts as "business" or "consumer."

85.    In order to determine which label to use, Branch depends solely on one piece of information provided by its partner enrolling workers into Branch Accounts. If Branch's partner, such as Walmart, classifies its workers as independent contractors for tax purposes, Branch will label those Branch Accounts as "business" accounts. If Branch's partner classifies its workers as employees for tax purposes, Branch uses the "consumer" account label.

86.    Branch does not give its accountholders the opportunity to select which account label is applied to their Branch Account, or inform accountholders which labels exist and what the differences are.

87.    Walmart and its Administrator classified Spark Drivers as independent contractors for tax purposes, so Branch typically labeled the accounts as "business" accounts, and included "business" account terms and conditions at the end of Spark Drivers' Branch access process.

88.    The terms and conditions for the "business"-labeled account state that accountholders are prohibited from using their accounts for personal, family, or household purposes, and that they are not entitled to the protections of EFTA and other federal consumer financial law.

89.    When assigning a "business" label to any Branch Account, Branch does not seek input from individual accountholders as to how they intend to use the account, or review any subsequent information as to how the accountholder does in fact use the account. Nor does Branch confirm whether the individual accountholders whose funds are placed in "business"-labeled accounts are in fact businesses, or perform a Know Your Business review before opening "business"-labeled accounts.

90.    Branch performs the same onboarding process for all Branch Accounts, including those provided to Spark Drivers, relying on the same personal consumer information—including consumers' names and social security numbers—to open the Branch Account.

91.     Branch takes no further action, before or after account opening, to determine whether the "business" or "consumer" label is appropriate for those Branch Accounts, including for Spark Drivers.

92.     Regardless of whether Branch applies the "business" or "consumer" label, the Branch Account operates almost exactly the same, with some differences in the amounts accountholders can transfer and the fees applicable to the account. For example, both versions of the account have a fee for an "instant" transfer from the Branch Account to an external account. For this service, an accountholder assigned a "business"-labeled account would pay a 20 percent higher instant transfer fee on a $300 transfer than a "consumer"-labeled account would pay on that same transfer. Interchange rates, the fee that banks charge merchants when a consumer makes a purchase using a debit card, are generally higher per transaction for business accounts.

93.     Branch accountholders use their accounts the same way regardless of the "business" or "consumer" label—after earnings are deposited, consumers use these accounts to purchase items for personal, household, and family use.

94.     For example, during the period when Defendants required Spark Drivers to access their earnings through a Branch Account, Spark Drivers' top use of the Branch debit card was for groceries, and other common uses were for pharmacy and clothing store purchases.

95.    Branch applies a single set of compliance policies and procedures regardless of whether an account is labeled "consumer" or "business," notwithstanding that different obligations would apply if Branch were truly offering accounts for business purposes and not for personal, household, or family purposes.

## Defendants' Misrepresentations About Instant Access to Wages and Same-Day Pay

96.    Defendants communicated to Spark Drivers that their new requirement that Spark Drivers receive earnings through Branch Accounts would enable Spark Drivers to be paid instantly or daily, something many drivers wanted. On or around July 22, 2021, Walmart's Administrator sent an email to Spark Drivers, telling them that Branch was a "new payment platform for same-day pay," and a "free digital wallet that gives you INSTANT ACCESS to the money you earned."

97.    In an August 12, 2021, press release announcing its partnership with Branch, Walmart's Administrator stated that Branch would provide "instant access to payouts" and have the ability to "receive payments on weekends."

98.    Walmart's Administrator repeatedly told Spark Drivers that same-day pay would be available in September 2021, and when that date passed, that same-day pay would soon be available.

99.    Walmart disseminated similar messaging to its associates responsible for communicating with Spark Drivers. Initially, Walmart told Spark Drivers that same-day pay would be coming September 2021. And scripts for Walmart associates directed them to tell Spark Drivers: "Using [Branch] allows us to give you access to your earnings must faster – soon, you'll have access to your earnings on a daily basis . . . ."

100.    Branch announced that "all" Spark Driver payouts would be made available via their mobile application and that "opting out is not an option at this time," but "we'll soon be processing payments on a daily basis, allowing you to get your money faster, instead of waiting for 'payday.'"

101.    Branch further told Spark Drivers that same-day pay through Branch would be available in September 2021, and when that date passed, that same-day pay would be offered "very soon" or in early 2022.

102.    Spark Drivers' communications to Walmart, Walmart's Administrator, and Branch indicate that Spark Drivers believed that Defendants would offer same-day pay through Branch Accounts, and they continued to ask Walmart, Walmart's Administrator, and Branch about the timeline for this capability and expressed frustration when it continued to be unavailable. Spark Drivers told Walmart that they would continue to drive for the Spark Driver program, and increase their participation, if Walmart offered instant or same-day

24

pay. Some drivers thought that same-day pay had already been implemented, and contacted Walmart to ask how to use it. Branch and Walmart continued to tell drivers that same-day pay would be made available. For example, as late as March 2022, a Spark Driver who contacted Walmart and asked about same-day pay was told that the capability was still in the works.

103.    Walmart's Administrator told Spark Drivers at least through June 2022 that Branch would offer same-day pay.

104.    Spark Drivers have never received same-day pay through the Branch Account.

## Branch's False and Misleading Statements About Account Transfer Capabilities

105.    Branch represents to consumers that consumers can, using the Branch mobile application, transfer funds for free to any other account.

106.    But the transfer options available in the Branch application do not allow consumers to transfer to any bank account for free; rather, consumers must either pay a fee to transfer funds to another debit card (Option 1), or connect their Branch Account to a third party, which facilitates a free ACH transfer to only certain financial institutions that partner with that third party (Option 2).

107.    Some consumers learned that they could not use the Branch application to transfer money to a bank account of their choice only after attempting to make a transfer and failing to do so.

### Branch's Inadequate Disclosures, Notices, and Error Resolution, and Misrepresentations about Stop Payments

108.   EFTA and its implementing Regulation E establish substantive rights and protections for consumers who use electronic fund transfer services and the liabilities and responsibilities of financial institutions or other persons who offer these services.

#### Branch's Deficient Error Resolution Practices

109.   Financial institutions that provide accounts as defined under Regulation E have to conduct a timely and reasonable investigation into consumers' Notices of Error, as defined by 12 C.F.R. § 1005.11(b)(1).

110.   Until April 2022, Branch did not have policies and procedures for handling Notices of Error or a mechanism for tracking Notices of Error or Error investigations. When Branch did establish policies and procedures specific to Notices or Error and Error investigations, those policies and procedures were deficient.

111.   From January 2020 to the present, Branch has failed to promptly initiate or conduct Error investigations in numerous ways.

112.   For example, if the consumer alleged a transfer was unauthorized due to theft or fraud and the merchant provided documentation that matched the accountholder's name and address, Branch would automatically decline the consumer's Notice of Error without further investigation.

26

113.   For Notices of Error regarding ACH transactions, from January 2020 through April 2022, Branch customer service representatives summarily rejected all Notices of Error and failed to conduct any Error investigations.

114.   Since April 2022, Branch has conditioned initiating Error investigations into Notices of Error concerning ACH transactions on a consumer submitting a written statement of unauthorized electronic fund transfer.

115.   For Notices of Error regarding debit card transactions, since January 2020, Branch has not initiated or conducted an Error investigation. Instead, Branch sends all of these Notices of Error to a third-party service provider (Chargeback Processor) which conducts a process through the debit card network that can return a consumer's charge to their card (chargeback).

116.   The chargeback process is distinct from a financial institution's obligations under Regulation E. The Chargeback Processor's chargeback process is not designed to ensure compliance with Regulation E.

117.   In instances where the Chargeback Processor determined that a consumers' chargeback was not successful, Branch took no further action with respect to the consumer's Notice of Error.

118.   Using the chargeback process in these circumstances did not constitute a reasonable investigation as required by Regulation E. By relying on the chargeback process, Branch failed to conduct investigations entirely.

119.   As a result of these practices, Branch failed to conduct reasonable Error investigations for thousands of consumers.

120.   Branch also did not meet required timeframes for its Error resolution:

a.   For numerous Errors that Branch did not resolve within 10 days of receipt of the Notice of Error, Branch did not provide provisional credit within that period;

b.   For numerous Errors concerning debit card transactions, Branch did not determine whether an Error occurred within 90 business days of receipt of the Notice of Error; and

c.   For numerous Errors, Branch did not report the results of its Error investigation to the consumer within 3 business days of determining whether an Error occurred.

***Branch's Failures to Provide Stop Payment***

121.   Under EFTA and Regulation E, financial institutions must provide consumers with the ability to stop payment of a preauthorized electronic fund transfer under certain circumstances.

122.   Since January 2020, as a matter of policy, Branch has not provided consumers with the ability to stop payment of preauthorized electronic fund transfers and Branch does not track when consumers made requests to stop payment.

123.    On numerous occasions, consumers notified Branch that they wanted to stop payment of a preauthorized electronic fund transfer at least 3 business days before the scheduled date of the transfer, but Branch did not effectuate the stop payment request.

124.    Though Branch had no mechanism for effectuating a stop payment, Branch told consumers otherwise, stating in its initial disclosures for its "consumer"-labeled accounts that the consumer had a right to stop payment.

### Branch's Deficient Disclosures & Notices

125.    Under EFTA and Regulation E, financial institutions also must timely provide certain disclosures and notices regarding accounts, and those disclosures and notices must contain certain information.

126.    Since 2020, initial disclosures for all Branch Accounts have misstated consumers' liability for unauthorized transfers.

127.    Initial disclosures for Branch "business"-labeled accounts falsely state that consumers "will not have the benefit of any consumer law limiting liability with respect to the unauthorized use of a Card or a Business Account" and they fail to state consumers' stop payment rights.

128.    Initial disclosures for Branch "consumer"-labeled accounts improperly describe consumers' liability for unauthorized transactions, stating, for example that "[t]he use of any of your Credentials by another person will be as

effective as your use of the Credentials, regardless of whether the person affixing the Credential was authorized by you and regardless of the means by which the Credential was affixed."

129.   Since 2020, Branch has not timely provided initial disclosures—initial disclosures have been provided after the first electronic fund transfer involving the account and after the consumer had contracted for an electronic fund transfer service.

130.   During this period, Branch has opened Branch Accounts capable of receiving electronic fund transfers, and often accepted deposits into those accounts, before providing consumers with the initial disclosures for the account.

131.   During this period, Branch has relied on its partners to identify the consumers who should receive their earnings through a Branch Account. Branch's partners often identify these consumers by sharing with Branch personal information for each worker. Branch then opens Branch Accounts after receiving this information—without having provided consumers with initial disclosures. It does not provide initial disclosures until after the consumer completes Branch's access process.

132.   Branch further permits partners, including Walmart, to initiate electronic fund transfers to consumers' accounts before consumers have gained access to those accounts and received Branch's initial disclosures.

30

133.   Since 2020, Branch accountholders have received periodic statements and error resolution notices within those statements that do not comply with EFTA and Regulation E.

134.   Branch's periodic statements provided to all consumers were not compliant with EFTA and Regulation E, because they did not include (i) the type of transfer and type of account to or from which funds were transferred; (ii) the terminal location, for transfers initiated by the consumer at an electronic terminal; and (iii) the amount of fees assessed against the account.

135.   The periodic statements also do not include correct information explaining how to submit a Notice of Error.

136.   Branch's periodic statement language reads, "To report an unauthorized transaction or other error concerning your debit card, direct inquiries to: call 833-994-0430, or email us at cardsupport@branchapp.com." But the consumer's right to make such inquiries applies to all types of Errors and are not limited to those involving debit cards.

137.   Since January 2020, Branch has failed to provide Error resolution notices that informed consumers of the types of Errors they can allege and did not inform consumers that they could contact Branch if they thought their statement was incorrect or if they need more information about a transfer listed on a statement or receipt.

*Branch's Poor Recordkeeping Practices*

138.    Regulation E requires financial institutions to "retain evidence of compliance with the requirements imposed by" EFTA. 12 C.F.R. § 1005.13(b)(1).

139.    Between at least January 2020 and April 2023, Branch's records pertaining to Errors and Notices of Error were often incomplete, missing, or failed to track complete information.

## THE FEDERAL CONSUMER FINANCIAL LAWS

### The CFPA

140.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" or "service provider" from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with "any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

141.    Section 1036 of the CFPA makes it unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person or service provider engaged in unfair, deceptive, or abusive acts or practices; the provider of substantial assistance is deemed in violation of the law to the same extent as the person to whom such assistance is provided. 12 U.S.C. § 5536(a)(3).

142.    The CFPA defines "consumer" to mean "an individual or an agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4).

143.   The CFPA defines "covered person" to mean "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6).

144.   The CFPA defines "service provider" to mean "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service . . . ." 12 U.S.C. § 5481(26).

145.   The CFPA defines "consumer financial product or service" to include "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer"; "selling, providing, or issuing stored value or payment instruments"; and "providing payments or other financial data processing products or services to a consumer by any technological means" where those products or services are "offered or provided for use by consumers primarily for personal, family, or household purposes." 12 U.S.C. § 5481(5), (15)(A)(iv), (v), (vii).

146.   Spark Drivers are individuals and are thus "consumers" under the CFPA.

147.   Branch engages in offering or providing Branch Accounts, which involves deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer; providing or issuing stored value or payment instruments; or providing payments or other financial data processing products or services to a consumer; thus Branch is a "covered person" under the CFPA.

148.   Branch Accounts are a financial product or service offered or provided for use by consumers, including Spark Drivers, primarily for personal, family, or household purposes, including groceries, housing, household utilities, transportation costs, childcare, and paying down personal debt.

149.   Walmart and its Administrator provided a material service to Branch in connection with Branch's offering or provision of Branch Accounts by providing Branch with over a million new accountholders—Spark Drivers—who they required to use Branch Accounts in order to receive earnings and continue working for the Spark Driver program. Walmart and its Administrator participated in the designing of Branch's account-opening process for Spark Drivers, obtained Spark Drivers' personal information and then provided Branch with that information with the instruction to use it to open Branch Accounts for the Spark Drivers. Walmart and its Administrator then maintained responsibility for providing Spark Drivers with the only means of accessing Branch Accounts—the

"magic link." Walmart and its Administrator are thus "service providers" under the CFPA.

## TISA and Regulation DD

150.   The Bureau is authorized to enforce TISA under subtitle E of the CFPA with respect to any person subject to TISA. 12 U.S.C. § 4309(a), (a)(3).

151.   Under TISA and its implementing Regulation DD, Branch is a "deposit broker," 12 U.S.C. § 4313(5), 12 C.F.R. § 1030.2(k), and a "person who advertises an account offered by a depository institution[.]" 12 C.F.R. § 1030.1(c).

152.   Under TISA, persons who advertise an account offered by a depository institution and deposit brokers are prohibited from making advertisements that are misleading or inaccurate or misrepresent a depository institution's contract. 12 U.S.C. § 4302(e); 12 C.F.R. §§ 1030.1(c), 1030.8(a)(1).

## EFTA and Regulation E

153.   The Bureau is authorized to enforce EFTA with respect to any financial institution subject to EFTA. 15 U.S.C. § 1693*o*(a)(5).

154.   Under EFTA and Regulation E, "financial institutions" are liable for their failure to comply with their stop payment, error resolution, disclosure, and notice obligations for the "accounts" of "consumers." 15 U.S.C. §§ 1693c, 1693d, 1693e, 1693f; 12 C.F.R. §§ 1005.7-1005.11. Regulation E further requires a "person" subject to EFTA to "retain evidence of compliance with" EFTA. 12

C.F.R. § 1005.13(b)(1). And EFTA prohibits any "person" from entering into a written agreement with a "consumer" that contains a "provision which constitutes a waiver of any right conferred or cause of action created by" EFTA. 15 U.S.C. § 1693*l*.

155.    EFTA defines "financial institution" to include a "person who, directly or indirectly, holds an account belonging to a consumer," 15 U.S.C. § 1693a(9) and Regulation E defines "financial institution" to include a "person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services," 12 C.F.R. § 1005.2(i).

156.    Regulation E defines "person" to mean "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j).

157.    Branch is responsible for developing and managing almost all aspects of the Branch Account, including the account application process, Know Your Customer review, payment processing, supervising and managing the flow of funds in accounts, the Branch mobile application, the provision of disclosures and notices, and all customer service functions, including dispute and error resolution. Branch also provides consumers with and services the only means of accessing the accounts—Branch's own mobile application and the physical debit card.

158.    Branch is a "financial institution" as defined under EFTA and Regulation E both because it (1) issues an access device to Branch Accounts through its mobile application and the associated access credentials, or through its debit card, and agrees with consumers to provide electronic fund transfer services and (2) it "indirectly holds" the Evolve deposit accounts that are a part of Branch Accounts and belong to consumers. Branch also meets the definition of a "person" under Regulation E.

159.    EFTA and Regulation E define "consumer" to mean "a natural person." 15 U.S.C. § 1693a(6); 12 C.F.R. § 1005.2(e).

160.    Accountholders of Branch Accounts, including Spark Drivers, are natural persons and thus are "consumers" under EFTA and Regulation E.

161.    EFTA defines "account" to mean "a demand deposit, savings deposit, or other asset account . . . , as described in regulations of the Bureau, established primarily for personal, family, or household purposes," 15 U.S.C. § 1693a(2), and Regulation E defines "account" to mean "a demand deposit (checking), savings, or other consumer asset account . . . held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes," 12 C.F.R. § 1005.2(b)(1).

162.    A Branch Account includes an Evolve deposit account, which is "a demand deposit (checking), savings, or other consumer asset account . . . held directly or indirectly by a financial institution."

163.    Branch Accounts opened since January 2020, including but not limited to Branch Accounts established for Spark Drivers, have been established primarily for personal, family, or household purposes.

164.    Branch Accounts opened since January 2020, including but not limited to Branch Accounts established for Spark Drivers, are "accounts" within the meaning of EFTA and Regulation E.

165.    The Bureau therefore may enforce EFTA and Regulation E with respect to Branch and Branch Accounts.

## DEFENDANTS' VIOLATIONS OF LAW

## COUNT I: ABUSIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA

### (Against Defendants)

***Defendants materially interfered with the ability of Spark Drivers to understand the terms and conditions of their Branch Accounts.***

166.    The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

167. An act or practice is abusive under the CFPA if it, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

168. From approximately June 2021 through approximately February 2023, Branch opened, and often accepted deposits into, Branch Accounts before Spark Drivers understood the terms and conditions of their Branch Accounts.

169. Before February 2023, Branch did not present information sufficient for Spark Drivers to understand the terms and conditions of Branch Accounts before it opened accounts on their behalf and stored earnings for them in those accounts.

170. From approximately June 2021 through approximately February 2023, Walmart did not present information sufficient for Spark Drivers to understand the terms and conditions of Branch Accounts before it shared Spark Drivers' personal information with Branch, instructed Branch to open Branch Accounts on behalf of those drivers, and sometimes deposited Spark Driver earnings into these accounts.

171. From approximately June 2021 through approximately August 2022, Walmart engaged in these acts or practices directly or through the acts of its Administrator, who was Walmart's agent. From approximately August 2022 through February 2023, Walmart directly engaged in the above acts or practices.

172.   Walmart also substantially assisted in Branch's material interference because it knew about, or recklessly disregarded, that conduct and substantially assisted in it.

173.   From approximately June 2021 through approximately August 2022, Walmart either provided this substantial assistance directly or through the acts of its Administrator, who was Walmart's agent. From approximately August 2022 through February 2023, Walmart provided this substantial assistance directly.

174.   Through these acts or practices, Defendants interfered with the ability of Spark Drivers to understand the terms and conditions of their Branch Accounts.

175.   Defendants' interference was material because the natural consequence of failing to disclose account terms and conditions is to impede consumers' understanding of the account, including that the account charged fees and included limitations on transactions and transfers. Their interference was also material because it did, in fact, impede consumers' understanding of the Branch Account.

176.   As a result, Defendants engaged in abusive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (d)(1), 5536(a)(1)(B), (a)(3).

## COUNT II: ABUSIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA

### (Against Defendants)

***Defendants took unreasonable advantage of Spark Drivers' inability to protect their interests in selecting and using Branch Accounts.***

177.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

178.   An act or practice is abusive under the CFPA if it, among other things, "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

179.   From approximately June 2021 through August 2023, Defendants took unreasonable advantage of Spark Drivers' inability to protect their interests in selecting and using Branch Accounts.

180.   Spark Drivers were not able to protect their interests in, for example, being able to choose when or whether to open a deposit account and when to share their personal information, being able to choose when to agree to a certain financial product, accessing their own earnings in a timely manner, and receiving their funds into accounts of their choosing that do not come with fees and other limitations.

181.   Spark Drivers were not able to protect these interests because of the harmful account opening and funding practices Defendants designed and imposed on Spark Drivers.

182.   Branch took unreasonable advantage of Spark Drivers' inability to protect the above interests. Branch increased its customer base beyond what it would have been able to obtain had it not opened accounts for consumers without their consent, and predicated consumers' access to their funds on their agreement to Branch Account terms and conditions. With this increased customer base, Branch earned additional revenue.

183.   Walmart took unreasonable advantage of Spark Drivers' inability to protect the above interests. Walmart was able to reduce the costs of paying its Spark Drivers, and scale the Spark Driver program more quickly.

184.   Walmart also substantially assisted in Branch's taking unreasonable advantage of Spark Drivers' inability to protect their interests in selecting and using Branch Accounts because it knew about, or recklessly disregarded, that conduct and substantially assisted in it.

185.   From approximately June 2021 through approximately August 2022, Walmart either provided this substantial assistance directly or through the acts of its Administrator, who was Walmart's agent. From approximately August 2022

through approximately August 2023, Walmart provided this substantial assistance directly.

186.   As a result, Defendants engaged in abusive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (d)(2)(B), 5536(a)(1)(B), (a)(3).

## COUNT III: UNFAIR ACTS OR PRACTICES IN VIOLATION OF THE CFPA

### (Against Defendants)

***Defendants employed unfair account opening and funding practices in connection with requiring Spark Drivers to be paid through Branch Accounts.***

187.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

188.   An act or practice is unfair under the CFPA if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

189.   From approximately June 2021 through approximately August 2023, Defendants engaged in unfair acts or practices. Branch offered Branch Accounts with harmful features, and Defendants required Spark Drivers to use the Accounts in order to receive their pay. Defendants opened and either accepted deposits (Branch), or made deposits (Walmart), into those accounts without Spark Drivers'

informed consent or on an unauthorized basis, and before Spark Drivers could agree to the terms and conditions and access the account, thereby coercing Drivers into accepting the product.

190.   Defendant's acts or practices caused substantial injury to consumers. Spark Drivers had no choice but to accept a product that included fees, limitations on use, delays in earnings access, and risk of loss of funds when using their Branch Accounts. And if Spark Drivers did not use the Branch Account, they risked the loss of already-earned wages along with future earnings with the Spark Driver program.

191.   Spark Drivers could not reasonably avoid these harms because they could not prevent Defendants from using their personal information to create Branch Accounts for them without their authorization or without their informed consent, or accepting deposits into those accounts to which they did not have access. And each option Branch offered consumers to either use or transfer funds came with harms, meaning a Spark Driver could not avoid all of the harms while they were required to receive earnings in the Branch Account.

192.   This substantial injury was not outweighed by countervailing benefits to consumers or to competition.

193.   From approximately June 2021 through approximately August 2022, Walmart engaged in these practices directly or through the acts of its

Administrator, who was Walmart's agent. From approximately August 2022 through August 2023, Walmart directly engaged in this conduct.

194.   Walmart also substantially assisted in Branch's unfair acts and practices because it knew about, or recklessly disregarded, that conduct and substantially assisted in it.

195.   From approximately June 2021 through approximately August 2022, Walmart provided this substantial assistance directly, or through the acts of its Administrator, who was Walmart's agent. From approximately August 2022 through August 2023, Walmart provided this substantial assistance directly.

196.   As a result, Defendants engaged in unfair acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), (c), 5536(a)(1)(B), (a)(3).

## COUNT IV: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE CFPA

### (Against Defendants)

*Defendants made deceptive statements about "instant access" and "same-day" payments.*

197.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

198.   An act or practice is deceptive under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting

reasonably under the circumstances and (3) the representation, omission, or practice is material.

199.   Defendants communicated to Spark Drivers that adoption of Branch Accounts would allow Spark Drivers to be paid daily, something many drivers had expressed they wanted.

200.   Branch and Walmart each directly made representations to Spark Drivers that adopting Branch Accounts would give them "instant access" to their pay or "same-day" or "daily" pay.

201.   Spark Drivers have never received instant or same-day pay through the Branch Account.

202.   Defendants' representations were material and likely to mislead Spark Drivers acting reasonably.

203.   As a result, Defendants engaged in deceptive acts or practices, in violation of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## COUNT V: VIOLATION OF TISA AND REGULATION DD

### (Against Branch)

*Branch's advertisements as to Branch Accounts were inaccurate or misleading.*

204.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

205.   TISA and Regulation DD prohibit an advertisement from being misleading or inaccurate, or from misrepresenting a depository institution's deposit contract. 12 U.S.C. § 4302(e); 12 C.F.R. § 1030.8(a)(1).

206.   Branch advertised to Spark Drivers that its Branch accounts provided instant access to wages and same-day pay when this capability was not available to Spark Drivers.

207.   Branch advertised that its Branch Accounts allowed consumers to make transfers for free to any bank account and to initiate stop payment when Branch Accounts did not provide these services.

208.   Branch's representations were inaccurate or misleading.

209.   As a result, Branch violated section 263 of TISA, 12 U.S.C. § 4302(e), and section 1030.8 of Regulation DD, 12 C.F.R.§ 1030.8(a)(1).

## COUNT VI: VIOLATIONS OF EFTA

### (Against Branch)

### *Branch included an impermissible waiver of EFTA rights in its accountholder agreements.*

210.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

211.   Under EFTA, "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by" EFTA. 15 U.S.C. § 1693*l*.

212.   Since it began offering its Branch "business"-labeled accounts in or around January 2021, Branch has included language in the terms and conditions stating that accountholders are not entitled to the protections of EFTA and other federal consumer financial laws.

213.   Accountholders of Branch "business"-labeled accounts are consumers under EFTA and the accounts are "accounts" within the meaning of Regulation E.

214.   As a result, Branch violated section 914 of EFTA, 15 U.S.C. § 1693*l*.

## COUNT VII: VIOLATIONS OF EFTA AND REGULATION E

**(Against Branch)**

***Branch failed to promptly initiate Error investigations and conduct reasonable Error investigations.***

215.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

216.   Regulation E provides that "A financial institution shall comply with the requirements [to investigate, report on, and correct errors] with respect to any oral or written notice of error from the consumer that: (i) Is received by the institution no later than 60 days after the institution sends the periodic statement or provides the passbook documentation, required by § 1005.9, on which the alleged error is first reflected; (ii) Enables the institution to identify the consumer's name and account number; and (iii) Indicates why the consumer believes an error exists

and includes to the extent possible the type, date, and amount of the error. . . ." 12 C.F.R. § 1005.11(b)(1) (Notice of Error).

217.    EFTA requires a financial institution to, upon receiving a Notice of Error, "investigate [an] alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days" of receiving a Notice of Error. 15 U.S.C. § 1693f(a).

218.    Section 1005.11 of Regulation E requires that a financial institution must begin its investigation promptly upon receipt of a Notice of Error and may not delay initiating or completing an investigation pending receipt of information from the consumer. *See* 12 C.F.R. pt. 1005, Supp. I cmt. 1005.11(b)(1)-2, 11(c)-2.

219.    When conducting an Error resolution investigation under EFTA and Regulation E, a financial institution must "determine whether an error has occurred," 15 U.S.C. § 1693f. This investigation "must be reasonable," 71 Fed. Reg. 1638, 1654 (Jan. 10, 2006).

220.    Branch failed to promptly initiate or conduct Error investigations in numerous ways, depending on the type of transaction at issue.

221.    For consumers' Notices of Error regarding ACH Transactions:

    a.    From approximately January 2020 through approximately April 2022, Branch failed to initiate or conduct an Error investigation into any Notice of Error; and

49

b.  From approximately April 2022 through the present, Branch has not initiated an Error investigation concerning ACH transactions until a consumer submits a written statement of unauthorized electronic fund transfer.

222.   For Notices of Error concerning debit card transactions, from approximately January 2020 through the present, Branch has not conducted reasonable Error investigations, but instead sends all Notices of Error to its Chargeback Processor to process a chargeback. If chargeback was not successful, Branch automatically determined that no Error occurred, without performing any investigation.

223.   For any Notice of Error alleging fraud in connection with an unauthorized transfer, since January 2020 Branch has not performed an investigation and automatically denies the Notice of Error if the merchant provided documentation matching the accountholder's name and address.

224.   As a result, Branch violated section 1693f of EFTA and section 1005.11 of Regulation E. 15 U.S.C. § 1693f(a)-(f); 12 C.F.R. § 1005.11(a)-(e).

## COUNT VIII: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to timely provide provisional credit and resolve Errors.***

225.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

226.   Under Regulation E, if a financial institution cannot complete an investigation of a Notice of Error within 10 business days, it may take up to 45 business days and 90 business days under certain circumstances. 12 C.F.R. § 1005.11(c)(1)-(3).

227.   If the financial institution needs this additional time, it generally must provide consumers with provisional credit. 12 C.F.R. § 1005.11(c)(2).

228.   The financial institution is required to report the results of the investigation to the consumer within 3 days of completing its investigation. 12 C.F.R. § 1005.11(c)(1), (c)(2)(iv).

229.   For numerous Errors that Branch did not resolve within 10 business days of receipt of the Notice of Error, Branch failed to provide provisional credit within those 10 days.

230.   For numerous Notices of Error, Branch failed to determine whether an Error occurred within 90 business days of receipt.

231.   For numerous Notices of Error, Branch failed to report the results of its investigation to the consumer within 3 business days of determining whether an Error occurred.

232.   As a result, Branch violated section 1005.11 of Regulation E. 12 C.F.R. § 1005.11(c).

## COUNT IX: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to stop payment of preauthorized electronic fund transfers.***

233.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

234.   EFTA and Regulation E give consumers the right to notify a financial institution to stop payment of a preauthorized electronic fund transfer. 15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(c)(1).

235.   As a matter of policy and in practice, Branch did not honor consumers' stop payment requests.

236.   Consumers notified Branch that they wanted to stop payment of a preauthorized electronic fund transfer at least 3 business days before the scheduled date of the transfer, but Branch did not effectuate the stop payment.

237.   As a result, Branch violated section 907 of EFTA and section 1005.10 of Regulation E. 15 U.S.C. § 1693e(a); 12 C.F.R. § 1005.10(c)(1).

## COUNT X: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to provide accountholders initial disclosures at the proper time.***

238.    The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

239.    EFTA and Regulation E require that at the time a consumer contracts for an electronic fund transfer service, or before the first electronic fund transfer is made involving the consumer's account, a financial institution shall make certain required initial disclosures. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.7(a).

240.    Since 2020, Branch opened accounts capable of receiving deposits, and often accepted deposits into those accounts, before providing the consumer with terms and conditions—or initial disclosures—for the account.

241.    Accordingly, Branch failed to provide consumers with initial disclosures at the time they contract for an electronic fund transfer service or before the first electronic fund transfer is made involving their account.

242.    As a result, Branch violated section 905 of EFTA and section 1005.7 of Regulation E. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.7(a).

## COUNT XI: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

*Branch failed to provide accountholders initial disclosures with the requisite information.*

243.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

244.   EFTA and Regulation E require that a financial institution must provide certain initial disclosures, including, among other things, a statement of the consumer's liability for unauthorized electronic fund transfers under section 1005.6 of Regulation E, and also a summary of the consumer's right to stop payment of preauthorized electronic fund transfers and the procedure for placing a stop payment order. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.7(b).

245.   Since 2020, initial disclosures for Branch Accounts have lacked accurate information concerning a consumer's liability for unauthorized transactions.

246.   Since 2021, Branch failed to include the consumer's stop payment rights in many initial disclosures.

247.   As a result, Branch violated section 905 of EFTA and section 1005.7 of Regulation E. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.7(b).

## COUNT XII: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to provide periodic statements with the requisite information.***

248.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

249.   EFTA and Regulation E require financial institutions to provide consumers with a periodic statement for each account to or from which electronic fund transfers can be made which includes: (1) with regard to each electronic fund transfer during the period, certain information about each transfer, including, among other things, the type of transfer and type of account to or from which funds were transferred and, for transfers initiated at an electronic terminal, the terminal location; (2) the amount of any fee or charge assessed by the financial institution during the period for electronic fund transfers or for account maintenance; (3) the balances in the consumer's account at the beginning of the period and at the close of the period; and (4) the address and telephone number to be used for inquiries or notices of errors. 15 U.S.C. § 1693d(a), (c); 12 C.F.R. § 1005.9(b).

250.   Since 2020, Branch has failed to provide periodic statements with details and correct information about transactions, fees, and how to submit a suspected Error.

251.   As a result, Branch violated section 906 of EFTA and section 1005.9 of Regulation E. 15 U.S.C. § 1693d(a), (c); 12 C.F.R. § 1005.9(b).

## COUNT XIII: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to provide Error resolution notices with the requisite information.***

252.   The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

253.   Regulation E requires financial institutions to provide to consumers with accounts to or from which electronic fund transfers can be made, on a yearly basis or with each periodic statement, an error resolution notice substantially similar to Model Form A-3. 12 C.F.R. § 1005.8(b); Appendix A-3 Model Forms for Error Resolution Notice.

254.   Since January 2020, Branch's Error resolution notices have failed to conform to Model Form A-3. In particular, they fail to inform consumers of the types of Errors they can allege and do not contain information directing consumers to contact the financial institution if they think their statement was incorrect, or if they need more information about a transfer listed on a statement or receipt.

255.   As a result, Branch violated section 1005.8 of Regulation E. 12 C.F.R. § 1005.8(b).

## COUNT XIV: VIOLATIONS OF EFTA AND REGULATION E

### (Against Branch)

***Branch failed to maintain records of compliance with EFTA.***

256.    The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

257.    Regulation E requires Branch to "retain evidence of compliance with the requirements imposed by" EFTA and Regulation E. 12 C.F.R. § 1005.13(b)(1).

258.    Since January 2020, Branch has not (1) retained complete and accurate information about Notices of Error and evidence of its compliance with EFTA and Regulation E with respect to Notices of Error; (2) maintained policies and procedures to honor stop payment requests; or (3) retained evidence of all instances when consumers requested stop payments.

259.    From January 2020 through approximately April 2022, Branch failed to maintain policies and procedures regarding the handling and investigation of Notices of Error.

260.    As a result, Branch violated section 1005.13 of Regulation E. 12 C.F.R. § 1005.13(b)(1).

## COUNT XV: VIOLATIONS OF THE CFPA BY VIOLATING TISA AND REGULATION DD, AND EFTA AND REGULATION E

### (Against Branch)

261.    The Bureau incorporates and re-alleges by reference Paragraphs 1 through 165.

262.    The CFPA defines "Federal consumer financial law" to include TISA and its implementing Regulation DD, and EFTA and its implementing Regulation E. 12 U.S.C. §§ 5481(12), (14).

263.    Under the CFPA, covered persons' violations of Federal consumer financial law are violations of section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

264.    As a result, Branch's violations of TISA and Regulation DD, and EFTA and Regulation E, as described in Counts V–XIV, constitute violations of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

### DEMAND FOR RELIEF

265.    The Bureau requests that the Court, as permitted by 12 U.S.C. § 5565:

a.    Permanently enjoin the Defendants from committing future violations of the CFPA, EFTA and Regulation E, and TISA and Regulation DD in connection with the offering and provision of consumer financial products to consumers;

b.  Grant additional injunctive relief as the Court may deem just and
    proper;

c.  Award monetary relief, including but not limited to the refund of
    monies paid; restitution; disgorgement or compensation for unjust
    enrichment; and the payment of damages;

d.  Award the Bureau civil money penalties;

e.  Award the Bureau the costs of bringing this action; and

f.  Award such other and additional relief as the Court may determine to
    be just and proper.

Dated: December 23, 2024          Respectfully Submitted,

                                  Eric Halperin
                                  *Enforcement Director*

                                  Deborah Morris
                                  *Deputy Enforcement Director*

                                  Rebeccah Bower
                                  *Assistant Litigation Deputy*

                                  *s/ Rebeccah G. Watson*
                                  By: REBECCAH G. WATSON
                                  (D.C. Bar No. 989313)
                                  (Motion for admission *pro hac vice* pending)
                                  Email: rebeccah.watson@cfpb.gov
                                  Tel.: (202) 435-7895

NICOLE A. MAURI
(Cal. Bar No. 330692)
(Motion for admission *pro hac vice* pending)
Email: nicole.mauri@cfpb.gov
Tel.: (202) 435-9799

1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff Consumer Financial
Protection Bureau*